Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,
GEICO Indemnity Co., GEICO General Insurance Company
and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and                    Docket No.:          (     )
GEICO CASUALTY COMPANY,

                                        Plaintiffs,

                                                              **Plaintiffs Demand a Trial**
        -against-                                             **by Jury**

MAX JEAN-GILLES, M.D., MJG MEDICAL P.C.,
MJG MEDICAL SERVICES P.C., WOMEN'S MEDICAL
CARE SERVICES, P.C., and JOHN DOE
DEFENDANTS "1" THROUGH "10,"

                                        Defendants.
------------------------------------------------------------------X

## **COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, Max Jean-Gilles, M.D., MJG

Medical P.C., MJG Medical Services P.C., Women's Medical Care Services, P.C., and John Doe

Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $470,000.00 that the Defendants wrongfully obtained from GEICO by submitting, or causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported range of motion and muscle strength tests, activity limitation tests, extracorporeal shockwave therapy ("ESWT") treatments, and "shockwave therapy baseline and progress" exams (collectively, the "Fraudulent Services"), which were allegedly provided to New York automobile accident victims insured by GEICO ("Insureds") and other insurers.

2.      Defendant Max Jean-Gilles, M.D. ("Jean-Gilles") is a physician licensed to practice medicine in New York who purports to own a series of medical professional corporations, including MJG Medical P.C., MJG Medical Services P.C., and Women's Medical Care Services, P.C. (collectively, the "PC Defendants"), that have billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  The PC Defendants purport to be legitimate professional corporations, but they operate on a transient basis, maintaining no stand-alone practices, having no patients of their own, and providing no legitimate or medically necessary services.

3.      Jean-Gilles, along with John Doe Defendants "1"-"10" (hereinafter, the "John Doe Defendants"), perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit the PC Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.      GEICO seeks to recover the monies wrongfully obtained from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,800,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and

(iv)     in many cases, the Fraudulent Services were provided – to the extent provided at all – by independent contractors rather than by employees of the PC Defendants, and therefore were unreimbursable.

5.      The Defendants fall into the following categories:

(i)      Defendant Max Jean-Gilles, M.D. ("Jean-Gilles") is a physician licensed to practice medicine in the State of New York, who purports to own the PC Defendants, and who is listed as the treating provider on virtually all the bills submitted to GEICO by the PC Defendants.

(ii)     Defendants MJG Medical P.C., MJG Medical Services P.C., and Women's Medical Care Services, P.C. are New York medical professional corporations, through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO.

(iii)    The John Doe Defendants are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

3

6.      As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services were provided – to the extent provided at all – by independent contractors, rather than by employees of Jean-Gilles or the PC Defendants.

7.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed GEICO.

8.      The charts annexed hereto as Exhibits "1", "2", and "3" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme began as early as 2019 and has continued uninterrupted through the present day, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services.

10.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $470,000.00.

## THE PARTIES

**I.**     **Plaintiffs**

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and issue automobile insurance policies in New York.

**II.**     **Defendants**

12.     Defendant Jean-Gilles resides in and is a citizen of New York.  Jean-Gilles was licensed to practice medicine in New York on or about January 30, 1986, and serves as the nominal owner of the PC Defendants.

13.     Defendant MJG Medical P.C. is a New York professional corporation incorporated on or about March 22, 2019, with its principal place of business in New York, and purports to be owned and controlled by Jean-Gilles.  MJG Medical P.C. has been used by Jean-Gilles and the John Doe Defendants to submit fraudulent billing to GEICO and other insurers.

14.     Defendant MJG Medical Services P.C. is a New York professional corporation incorporated on or about March 31, 2021, with its principal place of business in New York, and purports to be owned and controlled by Jean-Gilles.  MJG Medical Services P.C. has been used by Jean-Gilles and the John Doe Defendants to submit fraudulent billing to GEICO and other insurers.

15.     Defendant Women's Medical Care Services, P.C. is a New York professional corporation incorporated on or about July 18, 2006, with its principal place of business in New York, and purports to be owned and controlled by Jean-Gilles.  Since approximately February 2022, Women's Medical Care Services, P.C. has been used by Jean-Gilles and the John Doe Defendants to submit fraudulent billing to GEICO and other insurers.

16.     Upon information and belief, the John Doe Defendants reside in and are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

18.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

19.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.     GEICO underwrites automobile insurance in New York.

## I.       An Overview of the Pertinent Law Governing No-Fault Reimbursement

22.      New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.      No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

24.      An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

25.      Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

26.      Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

27.      The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New

York State or local licensing requirement necessary to perform such service in New York… (emphasis added).

28.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

29.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

30.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

31.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

32.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

33.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in

New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

34.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss…directly to the applicant or… upon assignment by applicant…shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law…

35.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

36.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

37.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

38.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    **Defendants' Fraudulent Scheme**

### A.    **Overview of the Scheme**

39.     Beginning in 2019, and continuing through the present day, Jean-Gilles, the PC Defendants, and the John Doe Defendants (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise unreimbursable services.

40.     The Fraudulent Services billed using the names of the PC Defendants were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

41.     Jean-Gilles did not operate the PC Defendants at any single, fixed location.

42.     Jean-Gilles, instead, operated the PC Defendants on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx, where the PC Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 1100 Pelham Parkway, Bronx;
- 1120 Morris Park Avenue, Bronx;
- 146 Empire Boulevard, Brooklyn;
- 160-59 Rockaway Boulevard, Jamaica;
- 170-04 Henley Road, Jamaica;
- 175 Fulton Avenue, Hempstead;
- 1975 Linden Boulevard, Elmont;
- 219-16 Linden Boulevard, Cambria Heights;
- 2386 Jerome Avenue, Bronx;
- 2451 E Tremont Avenue, Bronx;
- 2940 Grand Concourse, Bronx;
- 332 149th Street, Bronx;
- 3626 Bailey Avenue, Bronx;
- 3910 Church Avenue, Brooklyn;
- 4014A Boston Road, Bronx;
- 4250 White Plains Road, Bronx;
- 599 Southern Boulevard, Bronx;
- 60 Belmont Avenue, Brooklyn;
- 62-99 99th Street, Rego Park;
- 665 Pelham Road, New Rochelle;
- 717 Southern Boulevard, Bronx;
- 80-12 Jamaica Avenue, Woodhaven

43.     Defendants, in order to obtain access to the Clinics' patient base (i.e. Insureds), entered into illegal financial and kickback arrangements with unlicensed persons, who provided access to the patients that were treated, or who purported to be treated, at the Clinics.

44.     Defendants thereafter subjected Insureds at the Clinics to various medically unnecessary and illusory healthcare services, including range of motion and muscle strength tests, activity limitation tests, extracorporeal shockwave therapy treatments, and "shockwave therapy baseline and progress" exams, all solely to maximize profits without regard to patient care.

**B.     The Illegal Kickback and Referral Relationships at the Clinics**

45.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

46.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

47.     Jean-Gilles did not have his own patients at the Clinics and did nothing to create a patient base.

48.     Jean-Gilles did not advertise for patients, never sought to build name recognition or to make any legitimate efforts of his own to attract patients on behalf of any of the PC Defendants at the Clinics.

49.     Jean-Gilles did virtually nothing that would be expected of the owner of legitimate medical professional corporations to develop their reputation and attract patients to the Clinics.

50.     As Jean-Gilles did not have any patients of his own at the Clinics, the healthcare services that he could provide to the patients at the Clinics was limited and controlled by the owners of the Clinics, who were interested only in maximizing profits without regard to genuine patient care.

51.     The Clinics provided facilities for the PC Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

52.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance

company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

53.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 1120 Morris Park Avenue, Bronx from a "revolving door" of more than 100 purportedly different healthcare providers.

54.     Similarly, GEICO has received billing for purported services rendered at the clinic located at 2386 Jerome Avenue, Bronx from a "revolving door" of more than 40 purportedly different healthcare providers.

55.     Similarly, GEICO has received billing for purported services rendered at the clinic located at 2940 Grand Concourse, Bronx from a "revolving door" of more than 80 purportedly different healthcare providers.

56.     Similarly, GEICO has received billing for purported services rendered at the clinic located at 3910 Church Avenue, Brooklyn from a "revolving door" of more than 100 purportedly different healthcare providers.

57.     Similarly, GEICO has received billing for purported services rendered at the clinic located at 4014A Boston Road, Bronx from a "revolving door" of more than 45 purportedly different healthcare providers.

58.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care.

59.     For example, a physician who worked at the 3910 Church Avenue, Brooklyn location stated under oath that he ended his involvement with the Clinic at that location because of, among other things: (i) his concern about the manner in which patients were brought to the

Clinic; (ii) the manner in which the Clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.

60.     Jean-Gilles, in order to obtain access to the Clinics' patient base (i.e. Insureds), entered into illegal financial arrangements with unlicensed persons, including the John Doe Defendants, who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.

61.     The financial arrangements into which Jean-Gilles and the PC Defendants entered included the payment of fees ostensibly to "rent" space or personnel from the Clinics or fees for ostensibly legitimate business services such as marketing, advertising, consulting, billing, and collection services.   In fact, however, these were "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to the PC Defendants for medically unnecessary services at the Clinics.

62.     In further keeping with the fact that the payments made by the PC Defendants were actually disguised kickbacks made in exchange for patient referrals, the PC Defendants provided no legitimate or necessary services that warranted other providers at the Clinics to bring in the PC Defendants to the Clinics to treat patients.

63.     In furtherance of the Defendants' fraudulent kickback and referral scheme, multiple checks issued to MJG Medical P.C. were illegally exchanged for cash at a check-cashing facility in New Jersey – Cambridge Clarendon Financial Service, LLC d/b/a United Check Cashing ("Cambridge Clarendon").  More specifically:

- Virtually all of these checks were exchanged for cash by an individual named Alla Kuratova ("Kuratova"), who was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.

- From approximately May 2017 through May 2021, Kuratova illegally exchanged over $35 million worth of checks, made out to over 1,000 different companies, for cash at Cambridge Clarendon.

64.     The Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the PC Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

65.     The amount of the kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to the PC Defendants for the purported medically unnecessary services.

66.     Jean-Gilles had no genuine doctor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the PC Defendants. Instead, the Insureds were simply directed by the Clinics and the unlicensed persons associated therewith to subject themselves to treatment by whichever healthcare provider was working for the PC Defendants that day, because of the kickbacks paid by Jean-Gilles and the PC Defendants.

67.     The unlawful kickback and financial arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants realized significant financial benefit from these relationships because without access to the Insureds, the Defendants would not have had the ability to execute their fraudulent treatment and billing protocol and bill GEICO and other no-fault insurers.

68.     The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

69.     In fact, Jean-Gilles operated the PC Defendants in a "quick-hit" fashion, billing GEICO and other New York automobile insurers as fast as possible before shuttering their active

business activities in order to limit the opportunity for insurance companies to investigate the PC Defendants before Defendants reaped their ill-gotten gains.

70.     In further keeping with the fact that Jean-Gilles operated MJG Medical P.C. in the above-referenced "quick-hit" fashion, MJG Medical P.C. billed GEICO alone over $430,000.00 for range of motion tests, muscle strength tests, and activity limitation tests from May 2019 through October 2019, at which point Jean-Gilles ceased all treatment activity and shuttered MJG Medical P.C., continuing only to have MJG Medical P.C. hire law firms to pursue collection of the fraudulent charges from GEICO and other insurers.

71.     In further keeping with the fact that Jean-Gilles operated MJG Medical Services P.C. in the above-referenced "quick-hit" fashion, MJG Medical Services P.C. billed GEICO alone over $1.2 million for extracorporeal shockwave therapy treatments and "shockwave therapy baseline and progress" exams from June 2021 through mid-July 2021 (less than 2 months), at which point Jean-Gilles ceased all treatment activity and shuttered MJG Medical Services P.C., continuing only to have MJG Medical Services P.C. hire law firms to pursue collection of the fraudulent charges from GEICO and other insurers.

72.     In further keeping with the fact that Jean-Gilles operated Women's Medical Care Services, P.C. in the above-referenced "quick-hit" fashion, Women's Medical Care Services, P.C. billed GEICO alone over $820,000.00 for extracorporeal shockwave therapy treatments from late February 2022 through early April 2022 (less than 3 months), at which point Jean-Gilles ceased all treatment activity and shuttered Women's Medical Care Services, P.C., continuing only to have Women's Medical Care Services, P.C. hire law firms to pursue collection of the fraudulent charges from GEICO and other insurers.

### C.     The Defendants' Fraudulent Treatment and Billing Protocol

73.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentation.

74.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

75.     The predetermined protocol involved providing, or purporting to provide, a series of medically unnecessary, illusory and fraudulent services, including range of motion tests, muscle strength tests, and activity limitation tests purportedly performed and billed through MJG Medical P.C., extracorporeal shockwave therapy ("ESWT") treatments purportedly performed and billed through MJG Medical Services P.C. and Women's Medical Care Services, P.C., and "shockwave therapy baseline and progress" exams purportedly performed and billed through MJG Medical Services P.C., designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

76.     No legitimate physician or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol further described herein to proceed under his or her auspices.

77.     The Defendants perpetrated the fraudulent treatment and billing protocol described below because they sought to illegally profit from the fraudulent billing submitted to GEICO and other insurers.

1. **The Fraudulent Computerized Range of Motion Tests, Muscle Strength Tests, and Activity Limitation Tests Purportedly Performed and Billed Through MJG Medical P.C.**

78.     The Defendants subjected virtually every Insured referred to MJG Medical P.C. to duplicative, illusory and medically unnecessary range of motion and muscle strength testing (collectively, "ROM/MT") regardless of their individual medical needs in order to maximize the fraudulent billing submitted for each insured.

79.     In addition, the Defendants subjected many Insureds referred to MJG Medical P.C. to duplicative, illusory, and medically unnecessary activity limitation tests regardless of their individual medical needs in order to maximize the fraudulent billing submitted for each insured.

80.     The Defendants billed the ROM/MT to GEICO through MJG Medical P.C. under multiple units of CPT codes 95851 and 95831, generally resulting in hundreds of dollars' worth of charges for each session of ROM/MT "testing".

81.     The Defendants billed the activity limitation tests to GEICO through MJG Medical P.C. under multiple units of CPT code 97750, generally resulting in hundreds of dollars' worth of charges for each activity limitation test.

82.     The charges for the ROM/MT and activity limitation tests were fraudulent in that: (i) the ROM/MT and activity limitation tests were medically unnecessary; (ii) the Defendants unbundled the charges for the ROM/MT to artificially inflate the amount they could charge GEICO; and (iii) the ROM/MT and activity limitation tests were performed pursuant to the kickbacks that Jean-Gilles and MJG Medical P.C. paid at the Clinics in coordination with the John Doe Defendants not to treat or otherwise benefit the Insureds.

### a. Traditional Tests to Evaluate Range of Motion and Muscle Strength

83. The adult human body is composed of 206 bones joined at various joints that allow motion between body parts. These motions include but are not limited to flexion, extension, side-bending and rotation.

84. The measurement of the capacity of a particular joint to move through its full physiological motion is referred to as that joint's "range of motion."

85. A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired, healthy joint. In a traditional range of motion test, the limb is moved passively by the patient or actively by the evaluating practitioner. Evaluation of the patient's range of motion of various joints is either estimated by sight or measured through the use of a manual inclinometer and/or a goniometer (i.e., devices used to measure angles).

86. Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient flex, extend, or rotate a particular joint in a particular motion against manual resistance applied by the evaluating practitioner. For example, if the evaluating practitioner wanted to measure muscle strength in the muscles that flex or extend a patient's knee, he/she would apply resistance against the appropriate motion.

87. Thorough physical evaluations performed on patients with soft-tissue trauma include ROM/MT, inasmuch as these tests provide a point of reference for joint motion, injury assessment, and treatment planning. Unless the evaluating practitioner knows the extent of a given patient's joint mobility or muscle strength impairment, the evaluating practitioner will be substantially limited in his/her ability to properly diagnose or treat the patient's injuries and assess

their response to treatment. Evaluation of range of motion and muscle strength are essential components of the thorough evaluation of a patient.

88.     Since ROM/MT is conducted as an element of a soft-tissue trauma patient's initial examination, as well as during virtually all follow-up examinations, the NY Fee Schedule provides that ROM/MT is to be reimbursed as a component of the initial and follow-up examinations.

89.     Alternatively stated, healthcare practitioners cannot conduct and bill for initial examinations and follow-up examinations which include ROM/MT, then bill separately for duplicative, contemporaneously provided ROM/MT.

> **b.      The Defendants' Range of Motion and Muscle Strength Testing were Duplicative and Medically Unnecessary**

90.     To the extent that the Insureds actually received the initial examinations and follow-up examinations at the Clinics that were billed to GEICO, the Insureds received manual range of motion and manual muscle strength tests during those examinations.

91.     The charges submitted to GEICO for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the healthcare practitioners at the Clinics routinely submitted or caused to be submitted for initial examinations and follow-up examinations.

92.     Despite the fact that the Defendants knew that the Insureds had already undergone manual range of motion testing and manual muscle strength testing during their initial examinations and follow-up examinations at the Clinics, the Defendants systematically billed for, and purported to provide, duplicative, illusory, and medically unnecessary ROM/MT to Insureds.

93.     The Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insured's body while the Insured was asked to attempt various motions and movements. The computerized test was virtually

identical to the traditional, manual range of motion testing performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the practitioner manually documenting the Insured's range of motion.

94.     The Defendants then typically billed for the computerized range of motion tests through MJG Medical P.C. under multiple units of CPT code 95851.

95.     The Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to flex, extend, or rotate three to four separate times using specific muscle groups that effectuate emotion at the joint tested.  As with the computerized range of motion tests, the computerized muscle strength test was virtually identical to the traditional, manual muscle strength testing performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the practitioner manually documenting the Insured's muscle strength.

96.     The Defendants then typically billed for the computerized muscle strength tests through MJG Medical P.C. under multiple units of CPT code 95831.

97.     The information learned through the use of the computerized ROM/MT offered no clinical advantage over the information obtained through the traditional, manual ROM/MT that was an essential component of each Insured's initial and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was medically meaningless, and never resulted in a change in the patient's treatment plan.

98.     While ROM/MT can be a medically useful tool as part of research, under the circumstances employed by the Defendants, it represented purposeful and unnecessary duplication of the manual ROM/MT conducted during virtually every Insured's initial and follow-up examinations at the Clinics.

99.     Further to the point that the ROM/MT purportedly performed by the Defendants was medically noncontributory, the results of the ROM/MT purportedly performed by and through MJG Medical P.C. were typically not reviewed by the treating practitioner, adding to the ROM/MT's failure to provide any diagnostic value.

100.    The results of the ROM/MT purportedly performed by and through MJG Medical P.C. were virtually never discussed with the treating practitioner.

101.    The results of the ROM/MT purportedly performed by and through MJG Medical P.C. were virtually never evident in the treating practitioner's medical notes.

102.    The results of the ROM/MT purportedly performed by and through MJG Medical P.C. were virtually never used to alter or change the patients' course of a treatment.

103.    In further keeping with the fact that the ROM/MT purportedly performed by and through MJG Medical P.C. was medically useless, the NY Fee Schedule eliminated reimbursement for services provided under CPT codes 95851 and 95831 in October 2020.

104.    The Defendants rendered the ROM/MT pursuant to a preestablished protocol that: (i) did not aid in the assessment and/or treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

    c.    **The Defendants Fraudulently Unbundled Charges for the Range of Motion and Muscle Strength Testing**

105.    Not only did the Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests; they also impermissibly

unbundled their billing for the tests to maximize the fraudulent charges that they could submit to GEICO.

106.    Pursuant to the NY Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

107.    CPT code 97750, described as "Physical performance test or measurement (e.g. musculoskeletal, functional capacity), with written report, each 15 minutes", identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas.   These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation.   They also include creation of a written report.

108.    CPT code 97750 is a "time-based" code that – pursuant to the Fee Schedule in effect during the relevant time period – allowed for a single charge of $45.71 for every 15 minutes of testing. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would have been permitted a single charge of $45.71 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would have been permitted to submit two charges of $45.71 under CPT code 97750, resulting in total charges of $91.42, and so forth.

109.    The Defendants virtually always purported to provide computerized range of motion and muscle tests to Insureds on the same dates of service.

110.    The computerized range of motion and muscle tests – together – usually did not take more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle

tests that the Defendants purported to perform were medically necessary, the Defendants would usually have been limited to a single, time-based charge of $45.71 under CPT code 97750, for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

111.    Nonetheless, to maximize their fraudulent billing for the computerized range of motion and muscle tests, the Defendants unbundled what should have been a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $43.60 under CPT code 95831 (for the muscle tests); and (ii) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests).

112.    By unbundling what should have been a single $45.71 charge under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, the Defendants increased by significant orders of magnitude the charges for the ROM/MT that they submitted, or caused to be submitted, to GEICO.

### d.    The Medically Unnecessary Activity Limitation Tests

113.    In addition to the other Fraudulent Services, Defendants subjected many Insureds to medically unnecessary activity limitation tests, which were then billed to GEICO through MJG Medical P.C. using CPT code 97750.

114.    In many instances, Defendants subjected the Insureds to the medically unnecessary activity limitation tests at or around the same time as the Insureds received ROM/MT through MJG Medical P.C.

115.    Like their charges for the other Fraudulent Services, Defendants' charges for activity limitation tests were fraudulent in that the tests were: (i) medically unnecessary; and (ii)

performed pursuant to Defendants' fraudulent treatment protocol and improper kickback arrangements between Defendants and others.

116.    The Defendants purported to provide activity limitation tests to Insureds despite their knowledge that the activity limitation tests were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that were performed during the Insureds' initial examination and follow-up examinations at the Clinics that were billed to GEICO, along with the medically unnecessary ROM/MT purportedly conducted by the Defendants through MJG Medical P.C.

117.    Much like the duplicative computerized ROM/MT, the only substantive difference between the activity limitation tests and the manual range of motion and muscle strength tests purportedly provided during the Insureds' initial examinations and follow-up examinations at the Clinics is that the activity limitation tests generated a digital printout of the Insureds' muscle strength.

118.    The muscle strength data obtained through the use of the activity limitation tests was not significantly different from the information obtained through the manual muscle testing that was part and parcel of the examinations purportedly provided at the Clinics to the Insureds.

119.    Nor was the muscle strength data obtained through the use of the activity limitation tests significantly different from the data that Defendants obtained through the computerized ROM/MT they purported to provide to Insureds.

120.    Under the circumstances employed by the Defendants, the activity limitation tests represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during the examinations conducted at the Clinics, and of the medically unnecessary computerized ROM/MT conducted by the Defendants.

121.    In further keeping with the fact that the activity limitation tests purportedly performed by the Defendants and billed through MJG Medical P.C. were medically useless, the NY Fee Schedule eliminated reimbursement for services provided under CPT code 97750 in October 2020.

122.    Like the other Fraudulent Services discussed herein, the activity limitation tests were not meant to impact any Insured's course of treatment.  Rather, the activity limitation tests were performed as part of Defendants' pre-determined fraudulent billing and treatment protocols, which financially enriched Defendants at the expense of GEICO, and as part of the improper financial and kickback arrangements between Defendants and others.

### 2.    The Fraudulent Charges for "Extracorporeal Shockwave Therapy" and "Shockwave Therapy Baseline and Progress" Exams

123.    The Defendants subjected virtually every Insured referred to MJG Medical Services P.C. and Women's Medical Care Services, P.C. to medically unnecessary extracorporeal shockwave therapy ("ESWT") "treatments".

124.    The Defendants billed GEICO and other insurers for the ESWT treatments through MJG Medical Services P.C. and Women's Medical Care Services, P.C. using CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology.

125.    The Defendants' billing for ESWT treatments through MJG Medical Services P.C. and Women's Medical Care Services, P.C. under CPT code 0101T (i) generally resulted in multiple charges of over $700.00 for each session of ESWT treatment that they purported to provide, and (ii) falsely represented that Jean Gilles had performed the ESWT Treatments when in fact they were provided by unlicensed technicians not employed by Jean Gilles, MJG Medical Services P.C. or Women's Medical Care Services, P.C.

126.   In addition to the medically unnecessary ESWT treatments, the Defendants subjected virtually every Insured referred to MJG Medical Services P.C. to a medically unnecessary "shockwave therapy baseline and progress" exam.  They then, in turn, billed for the "shockwave therapy baseline and progress" exams through MJG Medical Services P.C. under CPT code 97799, which generally resulted in charges of $475.00 for each "shockwave therapy baseline and progress" exam they purported to provide.

      a.    **The Fraudulent Charges for Extracorporeal Shockwave Therapy Treatments**

127.   Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

128.   ESWT is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.  During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves that purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

129.   Typically, Defendants purportedly performed ESWT treatments on Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain. In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

130.   If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment,

physical therapy, and the use of over-the-counter and non-steroidal pain management medication. These clinical approaches are well-established. By contrast, the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational.

131. Of consequence, the claims submitted to GEICO by the Defendants were accompanied by an NF-3 form that falsely represented that Jean Gilles performed ESWT when in fact there was no involvement by Jean Gilles or any other licensed physician in the performance of the service.

132. The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols. According to the billing data, the Fraudulent Services were provided at multiple locations on the same day, with multiple instances of four or more separate treatment locations on some days. For example:

(i)   On June 15, 2021, Jean-Gilles purportedly performed ESWT through MJG Medical Services P.C. on 50 different GEICO Insureds at eight different locations in three different boroughs.

(ii)   On June 16, 2021, Jean-Gilles purportedly performed ESWT through MJG Medical Services P.C. on 59 different GEICO Insureds at nine different locations in three different boroughs.

(iii)   On June 24, 2021, Jean-Gilles purportedly performed ESWT through MJG Medical Services P.C. on 45 different GEICO Insureds at seven different locations in three different boroughs.

(iv)   On June 30, 2021, Jean-Gilles purportedly performed ESWT through MJG Medical Services P.C. on 44 different GEICO Insureds at seven different locations in three different boroughs.

(vi)   On March 14, 2022, Jean-Gilles purportedly performed ESWT through Women's Medical Care Services, P.C. on 28 different GEICO Insureds at five different locations in two different boroughs.

(vii)   On March 17, 2022, Jean-Gilles purportedly performed ESWT through Women's Medical Care Services, P.C. on 24 different GEICO Insureds at five different locations in two different boroughs and Nassau County.

133.    The fact that Jean Gilles did not perform any of the ESWT is further confirmed by the following: (i) from June 10, 2021 to July 9, 2021 (less than 1 month), Jean Gilles is claimed to have performed EWST through MJG Medical Services, P.C. on at least 407 separate Insureds; and (ii) from February 28, 2022 to April 5, 2022 (less than 6 weeks), Jean Gilles is claimed to have performed EWST through Women's Care Medical Services, P.C. on at least 194 separate Insureds.

134.    Once documented by the technicians, the Defendants billed GEICO for the performance of ESWT in the name of the PC Defendants using CPT code 0101T.

**CATEGORY III CODES**                                                              **0042T–0504T**
**Medical Fee Schedule**                                                    **Effective April 1, 2019**

| | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|
| ■ | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■  + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■  + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radio-logic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■  + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radio-logic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

135.    As noted above, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services,

and (ii) does not distinguish between a professional component and technical component, thus confirming that the service needs to be performed by a licensed physician to be reimbursable.

136.    Furthermore, the ESWT treatment allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under CPT code 0101T for several independent reasons.  In the first instance, the charges were fraudulent in that the unlicensed technicians did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.  Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

137.    Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it is not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

138.    In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental

and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

139.    As with the other Fraudulent Services, the billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol and was designed solely to financially enrich the Defendants rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

140.    The Defendants' engineered the fraudulent submission of charges for ESWT treatments on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the NY Fee Schedule to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile industry for more than a decade by, among other things, making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement, and controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

141.    In contrast to these changes, the NY Fee Schedule changes did not materially alter reimbursement for performance of ESWT and, for the first time, established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been

a Category III Code (0101T) with a "BR" designation, meaning definitive reimbursement had not previously been established.

142.    Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement, the fact that ESWT is considered an experimental technology, and because the peer reviewed literature does not support the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.  Further, if ESWT is properly performed, the service requires considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and typically not portable.

143.    Defendants nevertheless seized on the changes in the Fee Schedule (or lack thereof) and elected to have ESWT performed en-masse, billing the services under the names of MJG Medical Services P.C. and Women's Medical Care Services, P.C.

144.    In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates billing for the code once per date of service.  The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

145.    Notwithstanding the clear language of the code, Defendants fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) and submitting multiple bills to GEICO for each area of the body where the ESWT was performed.

146.    For charges submitted by MJG Medical Services, P.C., rather than submit a single bill for the treatment purportedly provided on a single date of service, the Defendants would submit

a separate bill for each body part purportedly treated on a particular date of service.  Collectively, these bills often totaled more than $1,400.00 for a single date of service.

147.   For example:

(i)   On June 9, 2021, the Defendants purportedly administered ESWT to an Insured named LB's right shoulder and cervical spine.  The Defendants then submitted two separate bills to GEICO through MJG Medical Services P.C. totaling more than $1,400.00.   On June 25, 2021, the Defendants purportedly administered additional ESWT to LB's right shoulder and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00. On July 9, 2021, the Defendants purportedly administered additional ESWT to LB's right shoulder and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On July 15, 2021, the Defendants purportedly administered additional ESWT to LB's right shoulder and cervical spine. Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.   In total, Defendants billed GEICO more than $5,600.00 for ESWT purportedly administered to LB over the course of 36 days.

(ii)   On June 10, 2021, the Defendants purportedly administered ESWT to an Insured named HS' right shoulder and cervical spine.  The Defendants then submitted two separate bills to GEICO through MJG Medical Services P.C. totaling more than $1,400.00.   On June 23, 2021, the Defendants purportedly administered additional ESWT to HS' right shoulder and right wrist.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On June 24, 2021, the Defendants purportedly administered additional ESWT to HS' thoracic spine and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On June 30, 2021, the Defendants purportedly administered additional ESWT to HS' right shoulder and thoracic spine. Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On July 2, 2021, the Defendants purportedly administered additional ESWT to HS' right shoulder and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On July 8, 2021, the Defendants purportedly administered additional ESWT to HS' thoracic spine and lumbar spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On July 9, 2021, the Defendants purportedly administered additional ESWT to HS' right shoulder and cervical spine.  Again, the Defendants then submitted two

separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  In total, Defendants billed GEICO more than $9,800.00 for ESWT purportedly administered to HS over the course of 29 days.

(iii)   On June 10, 2021, the Defendants purportedly administered ESWT to an Insured named SC's thoracic spine and lumbar spine.  The Defendants then submitted two separate bills to GEICO through MJG Medical Services P.C. totaling more than $1,400.00.   On June 24, 2021, the Defendants purportedly administered additional ESWT to SC's lumbar spine and thoracic spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00. On July 7, 2021, the Defendants purportedly administered additional ESWT to SC's right knee and right shoulder.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.   On July 15, 2021, the Defendants purportedly administered additional ESWT to SC's lumbar spine and cervical spine. Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.   In total, Defendants billed GEICO more than $5,600.00 for ESWT purportedly administered to SC over the course of 35 days.

(iv)   On June 9, 2021, the Defendants purportedly administered ESWT to an Insured named TA's lumbar spine and left shoulder.  The Defendants then submitted two separate bills to GEICO through MJG Medical Services P.C. totaling more than $1,400.00.   On June 15, 2021, the Defendants purportedly administered additional ESWT to TA's left shoulder and lumbar spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00. On June 16, 2021, the Defendants purportedly administered additional ESWT to TA's left shoulder and lumbar spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.   On June 22, 2021, the Defendants purportedly administered additional ESWT to both of TA's knees.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On June 28, 2021, the Defendants purportedly administered additional ESWT to TA's thoracic spine and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.   On June 29, 2021, the Defendants purportedly administered additional ESWT to TA's left shoulder and lumbar spine. Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On June 30, 2021, the Defendants purportedly administered additional ESWT to TA's thoracic spine and lumbar spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more

34

than $1,400.00    In total, Defendants billed GEICO more than $9,800.00 for ESWT purportedly administered to TA over the course of 21 days.

(v)     On June 11, 2021, the Defendants purportedly administered ESWT to an Insured named NA's cervical spine and right shoulder.  The Defendants then submitted two separate bills to GEICO through MJG Medical Services P.C. totaling more than $1,400.00.  On June 16, 2021, the Defendants purportedly administered additional ESWT to NA's right shoulder and thoracic spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00. On June 24, 2021, the Defendants purportedly administered additional ESWT to NA's right shoulder and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On June 25, 2021, the Defendants purportedly administered additional ESWT to NA's thoracic spine and right shoulder.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00. On July 1, 2021, the Defendants purportedly administered additional ESWT to NA's right shoulder and cervical spine.  Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  On July 2, 2021, the Defendants purportedly administered additional ESWT to NA's right shoulder and thoracic spine. Again, the Defendants then submitted two separate bills to GEICO through MJG Medical Services, P.C. totaling more than $1,400.00.  In total, Defendants billed GEICO more than $8,400.00 for ESWT purportedly administered to TA over the course of 21 days.

148.    These are only representative examples.  In the claims identified in Exhibit "2", the Defendants routinely submitted a separate bill for each body part purportedly treated by MJG Medical Services P.C. on a particular date of service.  In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) to three (3) times for each date of service.  The Defendants submitted separate bills for each body part purportedly treated by MJG Medical Services P.C. on a particular date of service because they knew that routinely submitting charges for thousands of dollars per date of service was more likely to arouse suspicion and draw attention to the Defendants' fraudulent scheme.

149.     Similarly, the Defendants routinely submitted multiple charges under CPT code 0101T for each body part purportedly treated by Women's Medical Care Services, P.C. on a particular date of service.

150.     For example:

(i)      On March 2, 2022, the Defendants purportedly administered ESWT to an Insured named CJ's thoracic spine, lumbar spine, and right elbow. The Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   On March 8, 2022, the Defendants purportedly administered additional ESWT to CJ's right shoulder, left shoulder, and thoracic spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   On March 14, 2022, the Defendants purportedly administered additional ESWT to CJ's left shoulder, thoracic spine, and cervical spine.   Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   On March 15, 2022, the Defendants purportedly administered additional ESWT to CJ's right shoulder, right knee, and cervical spine.  Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   In total, Defendants billed GEICO more than $8,440.00 for ESWT purportedly administered to CJ over the course of 14 days.

(ii)     On March 9, 2022, the Defendants purportedly administered ESWT to an Insured named BJ's lumbar spine, right shoulder, and left shoulder.  The Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   On March 10, 2022, the Defendants purportedly administered additional ESWT to BJ's cervical spine, lumbar spine, and left shoulder.  Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   On March 14, 2022, the Defendants purportedly administered additional ESWT to BJ's thoracic spine, left shoulder, and left knee.   Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00.   In total, Defendants billed GEICO more than $6,330.00 for ESWT purportedly administered to BJ over the course of 6 days.

(iii)    On March 1, 2022, the Defendants purportedly administered ESWT to an Insured named NG's thoracic spine, lumbar spine, and cervical spine.  The

Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 7, 2022, the Defendants purportedly administered additional ESWT to NG's right shoulder, cervical spine, and lumbar spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 9, 2022, the Defendants purportedly administered additional ESWT to NG's right shoulder, lumbar spine, and cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 14, 2022, the Defendants purportedly administered additional ESWT to NG's right shoulder, lumbar spine, and cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 16, 2022, the Defendants purportedly administered additional ESWT to NG's right shoulder, lumbar spine, and cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 17, 2022, the Defendants purportedly administered additional ESWT to NG's thoracic spine, lumbar spine, and cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. In total, Defendants billed GEICO more than $12,660.00 for ESWT purportedly administered to NG over the course of 17 days.

(iv)   On March 8, 2022, the Defendants purportedly administered ESWT to an Insured named AM's thoracic spine, lumbar spine, and cervical spine. The Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 10, 2022, the Defendants purportedly administered additional ESWT to AM's thoracic spine, cervical spine, and lumbar spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 14, 2022, the Defendants purportedly administered additional ESWT to AM's thoracic spine, lumbar spine, and cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 17, 2022, the Defendants purportedly administered additional ESWT to AM's thoracic spine, lumbar spine, and cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 21, 2022, the Defendants purportedly administered additional ESWT to AM's thoracic spine, lumbar spine, and

cervical spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. In total, Defendants billed GEICO more than $10,550.00 for ESWT purportedly administered to AM over the course of 13 days.

(v) On March 2, 2022, the Defendants purportedly administered ESWT to an Insured named AP's thoracic spine, lumbar spine, and cervical spine. The Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 4, 2022, the Defendants purportedly administered additional ESWT to AP's thoracic spine, cervical spine, and lumbar spine. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 11, 2022, the Defendants purportedly administered additional ESWT to AP's left shoulder and left ankle. Again, the Defendants then submitted two separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $1,400.00. On March 16, 2022, the Defendants purportedly administered additional ESWT to AP's cervical spine, left shoulder, and left ankle. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. On March 18, 2022, the Defendants purportedly administered additional ESWT to AP's lumbar spine, thoracic spine, and left ankle. Again, the Defendants then submitted three separate charges to GEICO under CPT code 0101T through Women's Medical Care Services, P.C. totaling more than $2,110.00. In total, Defendants billed GEICO more than $9,840.00 for ESWT purportedly administered to AP over the course of 16 days.

151. These are only representative examples. In the claims identified in Exhibit "3", the Defendants routinely submitted a separate charge for each body part purportedly treated by Women's Medical Care Services, P.C. on a particular date of service.

152. The fraudulent treatment and billing protocols employed by the Defendants is further illustrated by the formulaic nature in which the services were claimed to have been performed. More specifically, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

153. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

154. It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated at a specific Clinic would routinely require ESWT at or about the same time.

155. Even so, and in keeping with the fact that the ESWT purportedly performed by MJG Medical Services P.C. and Women's Medical Care Services, P.C. was not medically necessary and was performed pursuant to predetermined protocols designed to maximize profits, MJG Medical Services P.C. and Women's Medical Care Services, P.C. routinely provided ESWT to multiple Insureds involved in the same accident at or about the same time.

156. For example:

(i)     On April 27, 2021, two insureds – AA and MA – were involved in the same automobile accident.  Thereafter, AA and MA both – incredibly – received ESWT from MJG Medical Services P.C. on the same exact date, June 17, 2021.

(ii)    On May 15, 2021, two insureds – TA and AG – were involved in the same automobile accident.  Thereafter, TA and AG both – incredibly – received ESWT from MJG Medical Services P.C. on the same exact date, June 9, 2021.

(iii)   On May 22, 2021, two insureds – MD and RS – were involved in the same automobile accident.  Thereafter, MD and RS both – incredibly – received ESWT from MJG Medical Services P.C. on the same exact date, June 14, 2021.

(iv)    On April 13, 2021, two insureds – DP and MP – were involved in the same automobile accident.  Thereafter, DP and MP both – incredibly – received ESWT from MJG Medical Services P.C. on the same exact date, June 18, 2021.

(v)     On May 21, 2021, three insureds – TD, TJ, and JR – were involved in the same automobile accident.  Thereafter, TD, TJ, and JR all – incredibly –

received ESWT from MJG Medical Service P.C. <u>on the same exact date</u>, June 9, 2021.

(vi)    On February 12, 2022, two insureds – SB and AL – were involved in the same automobile accident.  Thereafter, SB and AL both – incredibly – received ESWT from Women's Medical Care Services, P.C. <u>on the same exact date</u>, March 1, 2022.

(vii)    On December 22, 2021, two insureds – NA and CJ – were involved in the same automobile accident.  Thereafter, NA and CJ both – incredibly – received ESWT from Women's Medical Care Services, P.C. <u>on the same exact date</u>, March 2, 2022.

(viii)    On February 8, 2022, two insureds – BB and DN – were involved in the same automobile accident.  Thereafter, BB and DN both – incredibly – received ESWT from Women's Medical Care Services, P.C. <u>on the same exact date</u>, March 3, 2022.

(ix)    On February 6, 2022, three insureds – CL, CP, and RM – were involved in the same automobile accident.  Thereafter, CL and CP both – incredibly – received ESWT from Women's Medical Care Services, P.C. <u>on the same exact date</u>, March 1, 2022, and RM received ESWT from Women's Medical Care Services, P.C. on March 8, 2022.

(x)    On January 15, 2022, two insureds – TH and GW – were involved in the same automobile accident.  Thereafter, TH and GW both – incredibly – received ESWT from Women's Medical Care Services, P.C. <u>on the same exact date</u>, March 9, 2022.

157.    These are only representative examples.  In many of the claims identified in Exhibits "2" and "3", two or more Insureds who had been involved in the same underlying accident received ESWT from MJG Medical Service P.C. and/or Women's Medical Care Services, P.C. at or about the same time, despite the fact that the Insureds were differently situated.

158.    As with the other Fraudulent Services, billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the service.

### b.     The Fraudulent Charges for "Shockwave Therapy Baseline and Progress" Exams

159.    In addition to the other Fraudulent Services, Defendants subjected many Insureds to medically unnecessary "shockwave therapy baseline and progress" exams, which were then billed to GEICO through MJG Medical Services P.C. using CPT code 97799.

160.    Defendants subjected the Insureds to the medically unnecessary "shockwave therapy baseline and progress" exams at or around the same time as the Insureds received ESWT treatments through MJG Medical Services P.C.

161.    Like their charges for the other Fraudulent Services, Defendants' charges for the purported "shockwave therapy baseline and progress" exams were fraudulent in that the tests were: (i) medically unnecessary; and (ii) performed pursuant to Defendants' fraudulent treatment protocol and improper kickback arrangements between Defendants and others.

162.    In fact, although the Defendants characterized the service purportedly provided as a "shockwave therapy baseline and progress" exam, the examinations consist of nothing more than the same computerized range of motion tests that (i) the Defendants previously provided through MJG Medical P.C. from May 2019 through October 2019, and (ii) were non-reimbursable as a result of the changes in the NY Fee Schedule.

163.    More specifically, the Defendants recharacterized the computerized range of motion tests as a "shockwave therapy baseline and progress" exam because, in October 2020, the NY Fee Schedule eliminated all reimbursement for computerized range of motion tests performed and billed under CPT codes 95851 and 97750.

164.    The Defendants recharacterized the computerized range of motion tests as a "shockwave therapy baseline and progress" exam in a deliberate attempt to circumvent the NY Fee Schedule's reimbursement restrictions for computerized range of motion tests.

165.    The Defendants purported to provide "shockwave therapy baseline and progress" exams to Insureds despite their knowledge that the "shockwave therapy baseline and progress" exams were (i) medically unnecessary, and (ii) duplicative of the manual range of motion and muscle strength tests that were performed during the Insureds' initial examination and follow-up examinations at the Clinics that were billed to GEICO.

166.    Much like the ROM/MT provided and billed through MJG Medical P.C., the information learned through the "shockwave therapy baseline and progress" exams offered no clinical advantage over the information obtained through the traditional, manual range of motion tests that were an essential component of each Insured's initial and follow-up examinations at the Clinics.  Again, in the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insureds' range of motion reading was medically meaningless, and never resulted in a change in the patient's treatment plan.

167.    Further to the point that the "shockwave therapy baseline and progress" exams purportedly performed by the Defendants were medically noncontributory, the results of the "shockwave therapy baseline and progress exams" performed by and through MJG Medical Services P.C. were typically not reviewed by the treating practitioner, adding to the "shockwave therapy baseline and progress" exams' failure to provide any diagnostic value.

168.    The results of the "shockwave therapy baseline and progress" exams purportedly performed by and through MJG Medical Services P.C. were virtually never discussed with the treating practitioner.

169.    The results of the "shockwave therapy baseline and progress" exams performed by and through MJG Medical Services P.C. were virtually never evident in the treating practitioner's medical notes.

170.     The results of the "shockwave therapy baseline and progress" exams purportedly performed by and through MJG Medical Services P.C. were virtually never used to alter or change the patients' course of treatment.

171.     The Defendants rendered the "shockwave therapy baseline and progress" exams pursuant to a preestablished protocol that (i) did not aid in the assessment and/or treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**D.     The Fraudulent Billing for Independent Contractor Services**

172.     The Defendants' fraudulent scheme also included submission of claims to GEICO on behalf of the PC Defendants seeking payment for services provided by independent contractors.

173.     Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

174.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors.  See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not

represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

175.    In total, more than 1,815 separate bills were sent to GEICO using the United States Mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Jean Gilles, while falsely representing in every bill that Jean Gilles was the provider of the service in question.

176.    The Defendants misrepresentations were consciously designed to mislead GEICO and other insurance companies into believing that they were obligated to pay for the Fraudulent Services.  In addition, knowing that insurance companies such as GEICO would deny the bill if the identity of who actually performed the services and their relationship to the billing provider were accurately represented, the misrepresentations, by design, allowed Defendants to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility reasons.

177.    The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never (i) employed by Jean Gilles or the PC Defendants, or (ii) under Jean Gilles' direction and/or control.

178.    In fact, the unlicensed technicians were performing services for multiple other "providers" being operated and controlled by the John Doe Defendants at the same time and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

179. Because the unlicensed technicians were independent contractors and not employed by the PC Defendants, the Defendants never had any right to bill or collect PIP Benefits in connection with those services.

### III. The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

181. To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

182. The NF-3s, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of the PC Defendants were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the PC Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii) The NF-3 forms, HCFA-1500 forms, and supporting documentation submitted to GEICO by and on behalf of the PC Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii) The NF-3 forms, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the PC Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv) The NF-3 forms, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the PC Defendants uniformly fraudulently concealed the fact that, in many instances, the Fraudulent Services were provided – to the extent provided at all – by independent contractors rather than by employees of the PC Defendants.

**IV.**     **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

183.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted or caused to be submitted to GEICO.

184.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

185.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

186.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

187.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

188.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the healthcare providers actually performing many of the Fraudulent Services on behalf of the PC Defendants in order to prevent GEICO from discovering that these healthcare providers were not employed by the PC Defendants.

189.    Additionally, the Defendants intentionally operated the PC Defendants for only a few months in order to avoid being subjected to any insurance company investigations.

190.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

191.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

192.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $470,000.00 based upon the fraudulent charges.

193.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Jean-Gilles and the PC Defendants
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

194.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

195.    There is an actual case and controversy between GEICO and the PC Defendants regarding more than $1,800,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO through the PC Defendants.

196.    Jean-Gilles and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

197.    Jean-Gilles and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

198.    Jean-Gilles and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

199.    Jean-Gilles and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants.

200.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Jean-Gilles and the PC Defendants have no right

to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Jean-Gilles
### (Violation of RICO, 18 U.S.C. § 1962(c))

201.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

202.    MJG Medical P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

203.    Jean-Gilles knowingly has conducted and/or participated, directly or indirectly, in the conduct of MJG Medical P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that MJG Medical P.C. was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) MJG Medical P.C. obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by MJG Medical P.C.'s employees.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

204.     MJG Medical P.C.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Jean-Gilles operated MJG Medical P.C., insofar as MJG Medical P.C. never operated as a legitimate medical practice, and therefore, acts of mail fraud were essential in order for MJG Medical P.C. to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by MJG Medical P.C. to the present day.

205.     MJG Medical P.C. is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by MJG Medical P.C. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

206.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $167,000.00 pursuant to the fraudulent bills submitted through MJG Medical P.C.

207.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Jean-Gilles and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

208.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

209.    MJG Medical P.C. is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

210.    Jean-Gilles and John Doe Defendants "1-10" are employed by or associated with the MJG Medical P.C. enterprise.

211.    Jean-Gilles and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of MJG Medical P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that MJG Medical P.C. was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) MJG Medical P.C. obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by MJG Medical P.C.'s employees.

212.    Jean-Gilles and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

213.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $167,000.00 pursuant to the fraudulent bills submitted through MJG Medical P.C.

214.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Jean-Gilles and MJG Medical P.C.**
**(Common Law Fraud)**

215.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

216.    Jean-Gilles and MJG Medical P.C. intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

217.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MJG Medical P.C. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich MJG Medical P.C. and Jean-Gilles; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of MJG Medical P.C., when in fact many of the billed-for services were provided by independent contractors.

218.    Jean-Gilles and MJG Medical P.C. intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through MJG Medical P.C. that were not compensable under the New York no-fault insurance laws.

219.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $167,000.00 pursuant to the fraudulent bills submitted through MJG Medical P.C.

220.    Jean-Gilles and MJG Medical P.C.'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

221.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against Jean-Gilles and MJG Medical P.C.**
**(Unjust Enrichment)**

222.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

223.    As set forth above, Jean-Gilles and MJG Medical P.C. have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

224.    When GEICO paid the bills and charges submitted by or on behalf of MJG Medical P.C. for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on MJG Medical P.C. and Jean-Gilles' improper, unlawful, and/or unjust acts.

225.    Jean-Gilles and MJG Medical P.C. have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Jean-Gilles and MJG Medical P.C. voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

226.    Jean-Gilles and MJG Medical P.C.'s retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

227.    By reason of the above, Jean-Gilles and MJG Medical P.C. have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $167,000.00.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against John Doe Defendants "1-10"**
**(Aiding and Abetting Fraud)**

228.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

229.    John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Jean-Gilles and MJG Medical P.C.

230.    The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to MJG Medical P.C. in exchange for illegal kickbacks from Jean-Gilles and MJG Medical P.C. and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

231.    The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would

have been no opportunity for Jean-Gilles or MJG Medical P.C. to obtain payment from GEICO and other insurers.

232.    John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Jean-Gilles and MJG Medical P.C. for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

233.    The conduct of John Doe Defendants "1-10" caused GEICO to pay more than $167,000.00 pursuant to the fraudulent bills submitted through MJG Medical P.C.

234.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

235.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Jean-Gilles
### (Violation of RICO, 18 U.S.C. § 1962(c))

236.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

237.    MJG Medical Services P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

238.    Jean-Gilles knowingly has conducted and/or participated, directly or indirectly, in the conduct of MJG Medical Services P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges

seeking payments that MJG Medical Services P.C. was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) MJG Medical Services P.C. obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by MJG Medical Services P.C.'s employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

239. MJG Medical Services P.C.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jean-Gilles operated MJG Medical Services P.C., insofar as MJG Medical Services P.C. never operated as a legitimate medical practice, and therefore, acts of mail fraud were essential in order for MJG Medical Services P.C. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by MJG Medical Services P.C. to the present day.

240. MJG Medical Services P.C. is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by MJG Medical Services P.C. in pursuit of inherently unlawful

goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

241.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $213,000.00 pursuant to the fraudulent bills submitted through MJG Medical Services P.C.

242.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**Against Jean-Gilles and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

243.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

244.    MJG Medical Services P.C. is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

245.    Jean-Gilles and John Doe Defendants "1-10" are employed by or associated with the MJG Medical Services P.C. enterprise.

246.    Jean-Gilles and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of MJG Medical Services P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that MJG Medical Services P.C. was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and

billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) MJG Medical Services P.C. obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by MJG Medical Services P.C.'s employees.

247.    Jean-Gilles and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

248.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $213,000.00 pursuant to the fraudulent bills submitted through MJG Medical Services P.C.

249.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Against Jean-Gilles and MJG Medical Services P.C.**
**(Common Law Fraud)**

250.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

251.    Jean-Gilles and MJG Medical Services P.C. intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

252.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MJG Medical Services P.C. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich MJG Medical Services P.C. and Jean-Gilles; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of MJG Medical Services P.C., when in fact many of the billed-for services were provided by independent contractors.

253.    Jean-Gilles and MJG Medical Services P.C. intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through MJG Medical Services P.C. that were not compensable under the New York no-fault insurance laws.

254.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $213,000.00 pursuant to the fraudulent bills submitted through MJG Medical Services P.C.

255.    Jean-Gilles and MJG Medical Services P.C.'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

256.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TENTH CAUSE OF ACTION**
**Against Jean-Gilles and MJG Medical Services P.C.**
**(Unjust Enrichment)**

257.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

258.    As set forth above, Jean-Gilles and MJG Medical Services P.C. have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

259.    When GEICO paid the bills and charges submitted by or on behalf of MJG Medical Services P.C. for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on MJG Medical Services P.C. and Jean-Gilles' improper, unlawful, and/or unjust acts.

260.    Jean-Gilles and MJG Medical Services P.C. have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Jean-Gilles and MJG Medical Services P.C. voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

261.    Jean-Gilles and MJG Medical Services P.C.'s retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

262.     By reason of the above, Jean-Gilles and MJG Medical Services P.C. have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $213,000.00.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

263.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

264.     John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Jean-Gilles and MJG Medical Services P.C.

265.     The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to MJG Medical Services P.C. in exchange for illegal kickbacks from Jean-Gilles and MJG Medical Services P.C. and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

266.     The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Jean-Gilles or MJG Medical Services P.C. to obtain payment from GEICO and other insurers.

267.     John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Jean-Gilles and MJG Medical Services P.C. for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

268.    The conduct of John Doe Defendants "1-10" caused GEICO to pay more than $213,000.00 pursuant to the fraudulent bills submitted through MJG Medical Services P.C.

269.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

270.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Against Jean-Gilles
### (Violation of RICO, 18 U.S.C. § 1962(c))

271.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

272.    Women's Medical Care Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

273.    Jean-Gilles knowingly has conducted and/or participated, directly or indirectly, in the conduct of Women's Medical Care Services, P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Women's Medical Care Services, P.C. was not eligible to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Women's Medical Care

Services P.C. obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Women's Medical Care Services P.C.'s employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

274.    Women's Medical Care Services, P.C.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jean-Gilles operated Women's Medical Care Services, P.C., insofar as Women's Medical Care Services, P.C. never operated as a legitimate medical practice, and therefore acts of mail fraud were essential in order for Women's Medical Care Services, P.C. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Women's Medical Care Services, P.C. to the present day.

275.    Women's Medical Care Services P.C. is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Women's Medical Care Services P.C. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

276.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $97,000.00 pursuant to the fraudulent bills submitted through Women's Medical Care Services P.C.

277. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
**Against Jean-Gilles and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

278. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

279. Women's Medical Care Services, P.C. is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

280. Jean-Gilles and John Doe Defendants "1-10" are employed by or associated with the Women's Medical Care Services, P.C. enterprise.

281. Jean-Gilles and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Women's Medical Care Services P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Women's Medical Care Services P.C. was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Women's Medical Care Services P.C. obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for

services were provided – to the extent that they were provided at all – by independent contractors, rather than by Women's Medical Care Services P.C.'s employees.

282.   Jean-Gilles and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

283.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $97,000.00 pursuant to the fraudulent bills submitted through Women's Medical Care Services P.C.

284.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Against Jean-Gilles and Women's Medical Care Services P.C.**
**(Common Law Fraud)**

285.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

286.   Jean-Gilles and Women's Medical Care Services P.C. intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent bills seeking payment for the Fraudulent Services.

287.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Women's Medical Care Services P.C. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the

billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Women's Medical Care Services P.C. and Jean-Gilles; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Women's Medical Care Services P.C., when in fact many of the billed-for services were provided by independent contractors.

288.    Jean-Gilles and Women's Medical Care Services P.C. intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Women's Medical Care Services P.C. that were not compensable under the New York no-fault insurance laws.

289.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $97,000.00 pursuant to the fraudulent bills submitted through Women's Medical Care Services P.C.

290.    Jean-Gilles and Women's Medical Care Services, P.C.'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

291.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Against Jean-Gilles and Women's Medical Care Services P.C.
### (Unjust Enrichment)

292.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

293.    As set forth above, Jean-Gilles and Women's Medical Care Services, P.C. have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

294.    When GEICO paid the bills and charges submitted by or on behalf of Women's Medical Care Services, P.C. for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Women's Medical Care Services, P.C. and Jean-Gilles' improper, unlawful, and/or unjust acts.

295.    Jean-Gilles and Women's Medical Care Services, P.C. have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Jean-Gilles and Women's Medical Care Services, P.C. voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

296.    Jean-Gilles and Women's Medical Care Services, P.C.'s retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

297.    By reason of the above, Jean-Gilles and Women's Medical Care Services, P.C. have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $97,000.00.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

298.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

299.     John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Jean-Gilles and Women's Medical Care Services, P.C.

300.     The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Women's Medical Care Services P.C. in exchange for illegal kickbacks from Jean-Gilles and Women's Medical Care Services, P.C. and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

301.     The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Jean-Gilles or Women's Medical Care Services P.C. to obtain payment from GEICO and other insurers.

302.     John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Jean-Gilles and Women's Medical Care Services P.C. for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

303.     The conduct of John Doe Defendants "1-10" caused GEICO to pay more than $97,000.00 pursuant to the fraudulent bills submitted through Women's Medical Care Services P.C.

304.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

305.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

306.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A.     On the First Cause of Action against Jean-Gilles and the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Jean-Gilles and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Jean-Gilles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $167,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Jean-Gilles and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $167,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Jean-Gilles and MJG Medical P.C., compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $167,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Jean-Gilles and MJG Medical P.C., more than $167,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $167,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Jean-Gilles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $213,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Jean-Gilles and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $213,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Jean-Gilles and MJG Medical Services P.C., compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $213,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Jean-Gilles and MJG Medical Services P.C., more than $213,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $213,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Jean-Gilles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Jean-Gilles and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Jean-Gilles and Women's Medical Care Services P.C., compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Jean-Gilles and Women's Medical Care Services P.C., more than $97,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper; and

P.      On the Sixteenth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $97,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: September 8, 2022

                                RIVKIN RADLER LLP

                                By:   _/s/ Barry Levy_____
                                Barry I. Levy, Esq.
                                Michael A. Sirignano, Esq.
                                Sean Gorton, Esq.
                                926 RXR Plaza

Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government
Employees Insurance Company, GEICO
Indemnity Company, GEICO General
Insurance Company and GEICO Casualty
Company*